**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

|  |  |
|---|---|
| In re the Application of<br>**TIMOTHY R. KELLY**,<br><br>        Petitioner,<br><br>and<br><br>**CHRISTINA ASHLEY TURNER**,<br><br>        Respondent. | Case No. 3:25-cv-247-SI<br><br>**FINDINGS OF FACT AND**<br>**CONCLUSIONS OF LAW** |

Leonard Williamson, LEONARD WARREN WILLIAMSON P.C., 1900 Hines Street SE, Suite 211, Salem, OR 97302; and Andrew M. Bonderud, THE BONDERUD LAW FIRM, P.A., 2130 Riverside Avenue, Jacksonville, FL 32204. Of Attorneys for Petitioner.

Sarah J. Crooks, Michael McCullough, and Justin J. Richter, PERKINS COIE, LLP, 1120 NW Couch Street, 10th Floor, Portland, OR 97209. Of Attorneys for Respondent.

**Michael H. Simon, District Judge.**

        Timothy R. Kelly ("Kelly") filed a Verified Petition for Return of Child to Habitual Residence ("Petition for Return") under the 1980 Convention on the Civil Aspects of International Child Abduction ("Convention"). Kelly requested the return to Mexico of his 27-month-old daughter ("MKK"). Kelly asserts that his former partner, who is the mother of MKK, Christina Ashley Turner ("Turner"), took MKK from Mexico to the United States in June 2024, in violation of Kelly's parental and custodial rights and in violation of the Convention. The

PAGE 1 – OPINION AND ORDER

Convention mandates that a child wrongfully removed from her country of "habitual residence" must be returned to that country unless, as relevant here, the return would pose a grave risk of harm to the child or otherwise place the child in an intolerable situation. Kelly argues that MKK's country of habitual residence is Mexico and that under the Convention the Court must immediately order MKK's return to Mexico.

Turner responds that Kelly fails to meet his prima facie burden under the Convention. Turner also argues that under Article 13(b) of the Convention, returning MKK to Mexico would create a grave risk of exposing her to "physical or psychological harm or otherwise place [MKK] in an intolerable situation." The Court held an expedited evidentiary hearing on March 27 and 28, 2025, at which both parties testified, presented exhibits, and provided testimony of other witnesses.[1] The Court also permitted the parties to file post-hearing briefs and response briefs. Considering the evidence and arguments presented in the Court filings and at the evidentiary hearing, the Court DENIES the Petition for Return. The evidence presented shows that returning MKK to Mexico would present a grave risk of exposing her to physical or psychological harm or otherwise place her in an intolerable situation.[2]

---

[1] Kelly called the following witnesses: himself; Charlene Shaver, a former neighbor in Mexico, who testified by video; and Christian Audova, a former client, who testified by video. Turner called the following witnesses: herself; Saul Martinez, a former neighbor in Mexico, who testified by video; and Samantha Narducci, Turner's sister.

[2] In considering whether returning MKK to Mexico poses a grave risk of danger, the Court evaluates "the degree of harm that could occur . . . . during the period necessary to obtain a custody determination." *Gaudin v. Remis*, 415 F.3d 1028, 1037 (9th Cir. 2005), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022); *see also In re ICJ*, 13 F.4th 753, 765 (9th Cir. 2021) (stating that the question for the "grave risk" analysis is whether the child would face the grave risk while the courts in the home country would "make a custody determination" (quotation marks omitted)), *abrogated on other grounds by Golan*, 596 U.S. 666. The Court does not consider general issues of child custody or what would make MKK most happy. *See* Conv. Art. 19 (instructing courts resolving a petition under the Convention not to make "a determination on the merits of any custody issue"); *Gaudin*, 415 F.3d at 1035 ("[T]he exception

**FINDINGS OF FACT**

The Court makes these findings of fact based on the exhibits submitted and the testimony presented at trial. Both parties agreed to substantially relax the rules of evidence. *See* 22 U.S.C. § 9005 ("With respect to any application to the United State Central Authority, or any petition to a court under section 9003 of this title, which seeks relief under the Convention, or any other documents or information included with such application or petition or provided after such submission which relates to the application or petition, as the case may be, no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court."); *see also Farr v. Kendrick*, 2019 WL 2568843, at *2 (D. Ariz. June 21, 2019) ("Rule 1101(d)(3) of the Federal Rules of Evidence provides that the Rules of Evidence 'do not apply' to 'miscellaneous proceedings such as . . . extradition and rendition,' and [a Hague Convention] proceeding is—in the Court's view— similar to an extradition proceeding."), *aff'd*, 824 F. App'x 480 (9th Cir. 2020); *Nisbet v. Bridger*, 2023 WL 6998081, at *2 (D. Or. Oct. 24, 2023) ("*Nisbet I*") ("Like the *Farr* court, this Court concluded that the most expeditious procedure, particularly given Petitioner's confinement abroad, would be 'to apply a relaxed admissibility standard during the hearing and then discount the evidentiary value of any dubious evidence during the fact-finding process.'" (quoting *Farr*, 2019 WL 2568843, at *2)), *aff'd*, 124 F.4th 577 (9th Cir. 2024) ("*Nisbet II*").

The Court accepted all exhibits that were submitted and will discount the evidentiary value of any dubious evidence during the fact-finding process. The Court finds the ultimate issue

---

for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest." (alteration in original) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)).

of the grave risk defense by clear and convincing evidence and all other facts by a preponderance of the evidence.

## A. Credibility Determinations

"Where based in whole or in part on a witness's testimony, the Court's findings reflect credibility determinations based on its assessment of, *inter alia*, the relevant witness's demeanor, bias, and the extent to which the testimony was inherently logical and consistent with the testimony of other witnesses and relevant documentary evidence." *See Swett v. Bowe*, 733 F. Supp. 3d 225, 243 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024).

The Court finds that Kelly's other witnesses were generally credible, although not particularly relevant. Ms. Shaver testified regarding a short period of time in which Kelly and Turner lived in the same neighborhood, and that they appeared happy. She noted that the longest period of time she spent with them was a barbeque that she hosted. When asked if she had the type of relationship with Turner that Ms. Shaver would expect Turner to confide in her about domestic violence, Ms. Shaver pointed out that they had a substantial age difference, talked with one another mostly about Turner's artwork, and were not "best buddies." She also testified that she did not speak with either Kelly or Turner after they moved out of Eve's Garden, when MKK was about six months old, until Kelly notified her about the breakup. Mr. Audova testified that he had no information about Kelly and Turner's relationship.

Turner's other witnesses also were generally credible, and they provided more relevant information. Mr. Martinez testified regarding an April 2024 violent encounter between Kelly and Turner, surveillance video from his house from the next day, and general information from living across the street from Kelly and Turner in Mexico. Samantha Narducci testified regarding her experiences with Kelly, and with MKK after Turner brought MKK to the United States.

As for Kelly and Turner, the Court finds that Turner generally is credible but Kelly lacks overall credibility. Turner testified consistently with other evidence in the record and admitted to facts even if they did not portray her in the best light, such as wanting to see Kelly when he threatened suicide because she believed his ploy or discussing when her mental health deteriorated and she did not want to take care of her dog anymore. Although both parties sometimes confused dates and other minor details, overall, Turner's demeanor and consistency with other evidence demonstrated greater credibility.

The Court's adverse credibility determination relating to Kelly's testimony is primarily based on the following considerations: (1) inconsistencies within Kelly's testimony; (2) inconsistencies and contradictions between Kelly's testimony and other evidence; (3) Kelly's attempts to manipulate Turner in a classic pattern of domestic violence perpetrators, including his admitted suicide threats that were a "ruse" and an insincere money transfer; (4) Kelly's demeanor while testifying; and (5) Kelly's repeated statements about his regret when his testimony showed that he lacked remorse, including by blaming Turner for Kelly's violence and rage and by characterizing his rage simply as being "passionate." Kelly's testimony on direct was designed to portray him as reasonable and even-tempered but was demonstrably false in many aspects. Some examples of the inconsistencies with Kelly's testimony include, but are not limited to:

1.      Kelly testified during cross that he only had three incidents of rage in his entire life. Mar. 27 Tr. 86:6-9. He stood by this answer multiple times. As of that testimony, Kelly knew that Turner was alleging three incidents of physical assault. Kelly denied having any incidents of rage against anyone else, including his family, his mother, or his father. *Id.* 86:10-18. Later, however, Exhibit 107 was played in court, which was a compilation of video clips put

together *by Kelly* himself and posted by him on the internet. This compilation showed Kelly screaming in rage at Turner on several occasions in addition to the three physical incidents, of which other videos had previously been shown in court. Additionally, *Kelly's* Exhibit 6, a video Turner had posted on the internet, contained several video clips, a few of which involve incidents other than the three physical assaults, and include Kelly yelling in rage. Further, Turner's sister Samantha Narducci testified that she stopped communicating with Kelly because of an "altercation" between Kelly, Turner, and her father. Mar. 28 Tr. 386:19-20. She "saw the type of person [Kelly] was, and . . . [she didn't] want to talk to that person." *Id.* 386:23-25. Turner also testified consistently with Ms. Narducci that Kelly got into a "screaming match" with Turner's father and acted in an aggressive manner. *See, e.g.*, Mar. 27 Tr. 180:20-181:18. Additionally, Kelly admitted having angry outbursts against both the California state judge and the Oregon state judge, both of whom Kelly stated were "biased" against him. There is no credibility to Kelly's assertion that he only had three incidents of rage in his life.

2.    Kelly testified on direct that he went to Turner in the kitchen and started "questioning her and asking" her about her "alienating" MKK from Kelly, and Turner responded that she wanted to break up. Mar. 27. Tr. 41:3-14. Kelly added that he asked what to do with MKK, Turner stated they would share custody "fifty-fifty," and Kelly responded "okay." *Id.* 41:15-18. A video of this incident, which is part of Exhibit 107, however, shows that Kelly did not simply question Turner nor did he merely respond with an "okay" to her proposed custody arrangement. Kelly went down to the kitchen and was screaming at Turner for a few minutes while she was doing the dishes. MKK was sitting on a counter and eventually reached up for Turner to hold MKK, which Turner did. Turner was soft-spoken and tried to calm Kelly. Despite this, Kelly continued to escalate. When Turner suggested breaking up and sharing

custody, Kelly stated: "How do you think about this [MKK]? Thanks mom for fu\*\*ing up your life. Cause why? Why do why do you want to, you want to split up now because why?" Turner responded: "Are you serious" and Kelly stated: "No, answer the question, why do you want to split up Tina, because what, you're gonna have to do something?" and he continued to become more angry, eventually stating that Turner "just want[s] to be taken care of, be fu\*\*ing lazy, watch TV, scroll your phone and fu\*\* our daughter up."

      3.      Kelly testified on direct that when Turner went into labor, after she labored for two days and was exhausted, he made the decision, "let's get you to a hospital and let's get you out of this pain." Mar. 27 Tr. 18:3-9. During cross, however, after trying to characterize the decision as one made by "both" he and Turner, he admitted that "ultimately" it was Turner's decision and that he remained "ready to deliver this baby." *Id.* at 100:8-14.

      4.      Kelly testified on direct with further details about MKK's birth. Mar. 27 Tr. 18:3-19:1. He described that she was past term and that Turner had labored at home for two days before "he" decided to go to the hospital. He explained that they she labored for another 16 hours after they got to the hospital. He noted that after the birth it was a "very terrible situation" because Turner had internal bleeding, MKK was put in the NICU, and Turner could not see MKK. Turner was in the hospital for five days and only after "efforts" by Kelly was Turner able to see MKK. He also explained that Turner was unable to go to the NICU unit and he had to bring pictures and videos of MKK to Turner's hospital room. *Id.* 21:14-25. During cross, however, Kelly denied that Turner had a traumatic birthing experience and described her internal injuries during birth as "what happens during birth." *Id.* 101:12-16. In response to the cross-examiner's statement, "It was a traumatic experience for [Turner]," Kelly responded, "I'm sorry to hear that." *Id.* 101:21-22.

5.      Kelly testified on direct regarding a violent incident between him and Turner on April 16, 2024, partially witnessed by his neighbor, Saul Martinez. Kelly testified that Mr. Martinez came over and told them that police in Mexico do not "put up with" domestic violence, and for him and Turner to "chill out" and so "we did." Mar. 27 Tr. 37:12-19. He explained that after Mr. Martinez came over, Kelly went into the house and Turner went to Mr. Martinez's house "for a while, and then she came back over," accepted Kelly's apology, and they "hung out" for the rest of the day. *Id.* 37:19-21, 38:6-9, 14-16. Mr. Martinez, however, testified that Turner spent the night at Mr. Martinez's house, that Kelly also was gone overnight, and that Mr. Martinez's video surveillance captured Kelly upon his return the next morning, when he started yelling at Turner again. Mar. 28 Tr. 380:21-381:25. That video capture is Exhibit 104, with a date stamp of April 17, 2024, and a time stamp of 9:22 AM. Mr. Martinez explained that the night before, Kelly got in his truck and left. *Id.* 382:12-14. Mr. Martinez had "a lot of concerns" about Turner's safety and he offered to drive her to the United States, but Kelly had taken her passport and MKK's papers. *Id.* 382:1-8, 17-19. Turner's testimony is consistent with Mr. Martinez's testimony, that Kelly left overnight and that Turner spent the night at Mr. Martinez's house. *See* Mar. 27 Tr. 208:13-16, 208:21-209:16. Kelly continued to deny during cross-examination that he left for the night or that Turner spent the night at the neighbor's. *See id.* Tr. 109:13-110:7.

6.      Kelly testified on direct that during the April 16, 2024, violent encounter between he and Turner, while reaching for MKK his hand "slipped" up to Turner's "collarbone" and he quickly let go. *See* Mar. 27 Tr. 37:1-8, 38:2-5. The video in Exhibit 105, however, shows that on April 17, 2024, Kelly admitted that he grabbed Turner while "shoving" her and he performs on camera the hand gesture he had used while grabbing Turner. It is a curved hand position, making

a "C" configuration with his thumb and the rest of his fingers, and he shoves his entire hand

forward in that "C" configuration. There is only one reasonable interpretation of that

movement—a person grabbing someone around the throat in strangulation. Additionally, on

cross, Kelly admitted to grabbing Turner's "neck." *Id.* 136:19-20. Further, in his "journal"

created on June 21, 2024, Kelly admits that he "pushed against [Turner's] neck." Ex. 115 at 5.

       7.     Kelly testified on direct that he left the October 22, 2024, California court hearing

on Turner's restraining order and was served with papers on the restraining order in Oregon. He

then went to his car to read those papers and after reviewing them, he started his vehicle, went to

exit the parking area, and discovered that he was behind Turner's vehicle. According to Kelly,

that was unintentional. Mar. 27 Tr. 47:21-48:5. Kelly stated that he "just waited, and she drove

off, and then I was next in line to pay for my parking. I paid for my parking, and then I left and

drove home." *Id.* 48:5-8. He denied following, gesturing at, or attempting to communicate with

Turner. *Id.* 48:9-18. He stated that he recorded the event, but he did not provide the recording as

evidence in the hearing before the Court. *Id.* 48:19-49:7.

      Turner's attorney for the California hearing, Mr. Torigian, however, reported a different

story to the Hayward police officer who responded to the scene. Ex. 118 at 3-4. He explained

that Kelly had been "irate" at the California hearing. Mr. Torigian added that he, Turner, and

Nicole Cassell, Turner's friend who works for Mr. Torigian, waited ten minutes before leaving.

When they exited the building, Kelly was sitting in his truck, facing the exit doors. Turner,

Mr. Torigian, and Ms. Cassell were parked in the row nearest the exit doors. Mr. Torigian got in

his car and left the lot and Turner got in her own car and left directly behind Mr. Torigian.

Mr. Torigian observed Kelly following Turner. Kelly followed directly behind Turner all the

way to the Hayward Police Department parking lot, when he continued down the street as Mr. Torigian and Turner pulled into the police parking lot. *Id.*

8.    Kelly testified on direct that he broke only one of Turner's tattoo machines, but in Exhibit 107, he stated that he broke her tattoo "machines," both orally and in superimposed text. Turner's testimony also was consistent with that video, explaining that Kelly broke both of her machines. Mar. 27 Tr. 224:1-15.

9.    On June 1, 2024, Kelly told Turner that he was thinking about killing her. She responded that she could break up with him without him murdering her. At trial, Kelly testified that his comment was a "sarcastic response." Kelly claimed that earlier Turner had made a suicidal comment, so that when they were fighting later Kelly said that "now you've got me thinking of taking your life, too." Mar. 27 Tr. 39:24-40:6. He explained the comment was not a threat but that it was similar to telling an alcoholic, "now you've got me thinking about drinking, too."[3] *Id.* 40:7-16.

Kelly's journal, however, prepared a few weeks after the event, provides a different story. Ex. 115 at 7. Kelly's journal explains that he tried to get Turner to understand his point about her insecurities that he had been trying to express for years. *Id.* Thus, he smashed her tattoo machine, and "told her that this is what you have been doing to me, that I hated her for all the pressure on me. I yelled and screamed I had been 'thinking' of taking of her life. It's not that I me[a]nt it[,] I just wanted her to see what I thought she was doing to me." *Id.* He mentions nothing about her purported suicidal ideation or that he was being sarcastic or making a comment in response to an

---

[3] That analogy is inapposite. That analogy fits telling a person with suicidal ideation, "Now you've got me thinking about suicide, too." Kelly's testimony on this point, and many others, simply is not credible.

earlier comment by her. Nor does he write that his statement had a "too" at the end of it. "Yelling and screaming" that you are thinking of killing someone is not a "sarcastic response."

Based on the Court's assessment that Kelly lacks credibility, the Court finds the following facts, without discussion of any contradictory testimony by Kelly, unless specifically relevant.

## B. Kelly and Turner's Background and Early Relationship

Kelly and Turner are both United States citizens. Neither are citizens of Mexico. Kelly has a son from a previous relationship from whom he is estranged. Kelly was incarcerated in the Federal Prison Camp at Sheridan, Oregon and was released in December 2002. His son was born shortly before Kelly went to prison. Kelly escaped the prison work camp, which was not fenced, three or four times for a few hours each to visit his former partner in a motel and see his baby son, and then returned before the inmate count.[4]

Kelly went to Mexico in 2015, although he did not obtain any long-term visa or permit. He returned to the United States in 2019. Kelly did not provide any evidence that he was legally present in Mexico during those four years.

Kelly and Turner met in Oregon in March or April 2020. Kelly was 48 years old, and Turner was 24 years old. Based on the recommendation of friend, Turner sought treatment from Kelly for situational depression after Turner's recent divorce. Kelly is a "spiritual healer" who offers treatment through hallucinogenic "plant medicines" and shamanic type ceremonies. Kelly is not a certified shaman nor trained in any medical field. He states that he is "self-taught" through his life experience. He also was trained as a "peer support specialist" in Oregon,

---

[4] Because of the age of this incarceration, it is not considered for credibility purposes. Instead, it is relevant to show a pattern of not following official rules.

although that position does not allow him to dispense medication. He asserts that he is able to dispense hallucinogenic Schedule I medications based on his religious freedom.

Turner attended a group "microdosing" ceremony in which Kelly gave Turner a microdose of Bufo alvarius, which is venom from a toad. When she did not feel effects from the microdose, Turner agreed to a full dose. She then stayed after the other group clients left and hung out with Kelly. They agreed to meet up again.

Within a few days from their first meeting, Kelly and Turner began a romantic relationship and moved in together. Kelly was living in his trailer, pulled by his truck, traveling and occasionally performing healing ceremonies. Turner moved into the trailer with Kelly. Although it was during the COVID-19 pandemic, they began traveling around the country, staying on public land for no more than two weeks at a time. Turner underwent three more "plant medicine" ceremonies, but she did not have good results and did not wish to continue taking the drugs.

After two years of traveling, they returned to Oregon in approximately January 2022. On the drive back, Kelly and Turner got into a verbal altercation. Kelly yelled at Turner and forced her out of the truck on the side of the freeway. She walked about three miles to the next exit, where Kelly was waiting for her.

When they reached Oregon, they lived in an apartment owned by Turner's father for about two months. That ended when Kelly got into "screaming match" with Turner's father, becoming aggressive and causing Turner's father to be in fear. Turner's father requested that Kelly back up and not touch Turner's father.

Kelly and Turner moved to an Airbnb. Kelly told Turner that her birth control pills had kept her from obtaining the full effects of the "plant medicine" and that it was bad for her system

overall. She agreed to stop taking birth control in March 2022. Turner got pregnant in April 2022 and discovered her pregnancy in May 2022. When she told Kelly, his first reaction was to tell Turner to get an abortion. After she stated that she would raise the child on her own, Kelly backed down and the parties agreed to raise the child together. Turner worked long days as a tattoo artist, earning up to $16,000 per month, to save money.

When Turner was seven months pregnant, the parties reached a crossroads. They were debating opening a tattoo shop in Corvallis, Oregon, or moving to Mexico and opening a healing retreat where Kelly would work and Turner could raise their child. They visited Mexico, where Kelly performed a plant medicine ceremony for a client. Turner agreed that moving to Mexico was the best plan, particularly because she could stay at home with the baby. She was unsure how she could raise a newborn and run a new tattoo shop. They decided in October 2022 to move to Mexico.

**C. Kelly and Turner's General Relationship in Mexico**

The parties moved to Mexico with Turner driving the truck and trailer and two dogs while seven months pregnant. Kelly flew to Texas to meet a new client and bring him to Mexico. Kelly and Turner worked with that client for more than a month, while the client went through detox and had some bad experiences with Kelly's "plant medicines," including seizures. On one occasion Turner had to assist the client during a seizure while she was alone and eight months pregnant.

The parties planned a home birth in Mexico. After two days of labor, Turner decided to go to the hospital. She gave birth to MKK in San Diego on January 29, 2023. Both Turner and MKK had complications. They were in the hospital for five days. At the time, Kelly was 51 years old and Turner was 27 years old. On February 3, 2023, the parties returned to Mexico to live and raise MKK.

PAGE 13 – OPINION AND ORDER

The parties did not apply for temporary resident visas, work visas, or permanent resident visas in Mexico. They also did not obtain a visitor's permit or tourist visas.[5] They did not apply for dual citizenship for MKK or any legal status for her in Mexico. Kelly explained, and Turner confirmed, that Kelly was "anti-government." The parties did, however, intend at that time to stay and raise MKK in Mexico.

The parties lived in three places in Mexico during the next 20 months. The first was a one-bedroom house in La Misión, where they lived for approximately six months.[6] The second was a one-bedroom house in Eve's Garden, a small community of less than 15 homes in Baja California, where they lived for about three months, from around April 2023 to July 2023. After a client posted a video about their retreat that went viral, their business picked up and they moved to their third home, in Rosarito. This house was larger, with four bedrooms and two

---

[5] Kelly testified that he had obtained "many" visitor permits and his passport was "stamped with a bunch of stamps." Mar. 27 Tr. 77:16-19. The Court does not find this testimony credible. Kelly did not provide any evidence that he completed Mexico's visitor permit form, Forma Migratoria Múltiple ("FMM"), during the relevant time, or provide a copy of his "stamped" passport. Additionally, the Court takes judicial notice that until October 2022, the visitor permit, through the FMM, was in hard copy, not a passport stamp, and at that time a pilot program was introduced *at select airports* to implement digital forms with passport stamps. *See, e.g.*, U.S. Embassy & Consulates in Mexico, *Alert: Changes to Mexican Immigration Procedures* (Oct. 4, 2022), https://mx.usembassy.gov/alert-changes-to-mexican-immigration-procedures/ (explaining that Mexico was "implementing" a new "pilot program" in some select airports to use passport stamps instead of the paper FMM, noting that the Mexico immigration authority had "not yet updated its website to reflect this change in procedures or the pilot program," and reminding U.S. citizens that they are required to carry the paper FMM if they still receive one). Kelly, however, testified that both he and Turner *drove* into Mexico in October 2022. *See* Mar. 27 Tr. 96:14-23. The parties both testified that they stayed in Mexico until MKK's birth and that they did not fly across the border for that birth.

[6] Kelly testified they lived in La Misión for one year, but that could not have been possible based on his other witnesses' testimony. They moved to Eve's Garden shortly after MKK's birth in January 2023, and they moved to their third house in July 2023. They moved to Mexico in October 2022, so they could not have lived in the first house for "one year."

stories. They lived there from about July 2023 until Turner and MKK left in June 2024. Kelly offered his healing "retreat" at all three locations.

Their final home in Rosarito was in a gated community. It had an enclosed front courtyard. It was in a developing neighborhood, with homes under construction. There were no children nearby other than Saul Martinez's baby across the street, who was seven months younger than MKK. That baby visited MKK three or four times. The parties did not interact with neighbors or community members other than the Martinez's, who live in the United States and visited Mexico once or twice a month. Kelly and Turner primarily stayed in their house. They had a chef (Pancho) and an assistant chef (Chelo), the chef's wife, who would assist with client retreats. Chelo would sometimes babysit MKK and had a close bond with her. Kelly and Turner also occasionally hired a massage therapist and had a yoga instructor for one retreat.

At first, Kelly allowed Turner to participate in the healing ceremonies. After MKK was born, however, he found MKK to be disruptive and Turner to have "negative energy," so he required Turner and MKK to leave during the time clients were present and ceremonies were performed. At Eve's Garden, Turner and MKK had to stay in a small trailer, which had no electricity, running water, or plumbing. At Rosarito, Turner and MKK stayed in a spare bedroom in Saul Martinez's house across the street that was finishing construction. It did not have a stove or table but otherwise was mostly furnished. Turner had to stay in isolation for a long time, which affected her mental health. When she tried to go to the house she supposedly shared with Kelly, Kelly would get upset.

Both parties contributed to caregiving responsibilities for MKK, although Turner was the primary caregiver. Turner and MKK slept together in one room downstairs and Kelly slept in a

separate bedroom upstairs. Kelly and Turner hosted MKK's first birthday party in January 2024 in Mexico. Turner's mom visited from the United States to celebrate.

**D.  Kelly's Abusive Conduct Before Turner Left with MKK**

Kelly has long had rage issues. Before the most relevant months in 2024, there were countless occasions when Kelly exhibited incidents of rage against Turner, her family members, his family members, his friends, his clients,[7] police officers, border patrol agents, and others. Some earlier examples include one instance that resulted in Kelly's mother calling the police and another that resulted in his father retrieving a gun in self-defense. Two other examples are the incident in which Kelly terrorized Turner's father and the incident in which Kelly left Turner on the side of a freeway and made her walk three miles to the next exit. Another example is when a woman came to help Kelly and Turner with their retreat, but within a week Kelly had verbally harassed her and she returned to the United States. *See* Mar. 28 Tr. 278:18-21. Not counting short incidents of rage such as these examples, there also were "at least a dozen" times when Kelly was in a rage against Turner "[t]he whole entire day." Mar. 27 Tr. 215:19-216:3.

Kelly also had an earlier incident of violence against Turner. On May 14, 2023, Mother's Day, when MKK was 15 weeks old, Kelly and Turner got into an argument about another woman. MKK was in her baby sling on Turner's chest. As Turner was leaving the room, Kelly threw a reusable plastic water bottle at Turner. It hit MKK instead. After Turner told Kelly that the water bottle had hit the baby, Kelly slapped Turner, while she was still holding MKK in her baby sling.

---

[7] Kelly required his clients to sign a non-disclosure agreement. This started after he got into a verbal fight with a former client, who then posted negative information about Kelly. Mar. 28 Tr. 278:22-279:18.

In 2024, Kelly's retreat business was failing. Kelly was stressed and frustrated with Turner. Turner continued to perform tattoo work as well as help with the retreat business. She performed marketing and social media work for the retreat. Kelly, however, was angry that Turner was not adequately performing her marketing and social media work, and believed she was instead being lazy, scrolling on her phone, texting with friends, and watching television. He responded with more and more rage. His escalating behavior was credibly described by witnesses or caught on video.

On April 16, 2024, Kelly and Turner had a rage-filled, violent encounter. It began as a verbal fight, with Kelly yelling at Turner. Turner had MKK in her baby sling. Turner decided to leave the house. As she reached the door, Kelly tried to grab MKK out of the sling and then grabbed Turner by the neck and began to strangle her. Turner cried out and Kelly let go. Turner ran outside and Kelly followed. Kelly pinned Turner against the gate at the front of the house, in the courtyard. MKK remained in her sling, between Turner and Kelly. Kelly screamed that Turner could not leave and take his daughter, with his face right up against Turner's. This encounter was broken up by their neighbor, Mr. Martinez, who could hear Kelly screaming at Turner from inside Mr. Martinez's house.

Kelly left overnight and Turner and MKK spent the night at the Martinezes'. Mr. Martinez was very concerned about Turner's safety. Although Mr. and Mrs. Martinez offered to drive Turner and MKK to the United States, Kelly had taken their paperwork and Turner was worried about leaving her dog with Kelly, so she declined.

Mr. Martinez's video surveillance from April 17, 2024, depicts Kelly after he returned the next morning. He admits that he "smacked" Turner and that Kelly grabbed her, with his hand

outstretched in a curved position. Ex. 104. Based on the video, Kelly is admitting that he grabbed Turner around the neck in a strangulation maneuver. Kelly is again yelling on the video.

In an undated video taken after April 17, 2024, Kelly is shouting at Turner to "go get our sh*t out of [Mr. Martinez's] f*cking house. You are not f*cking going back over there unless it is for our f*cking retreats." Ex. 6. MKK can be heard screaming in distress in the background.

Sometime in April or May 2024, Turner was holding MKK while she was playing with leaves on a plant that grew along the upstairs railing in the house. Kelly was in a rage and started ripping the plant off the railing and ended up ripping off part of the railing, causing MKK to cry in distress.

On May 27 or 28, 2024, Turner was doing dishes when Kelly came downstairs. This is the encounter described above when Kelly yelled at Turner for engaging in "parental alienation," MKK reached up to be held by Turner, Turner stated that she wants to break up, and Kelly continued to escalate. Ex. 107. By the end of Kelly's escalation and shouting, MKK was crying. From this point until June 1, 2024, Kelly was essentially in a constant state of rage and Turner tried to avoid him as much as possible.

Also on May 27, 2024, Turner and Kelly had recently watched the movie "*Brothers*," in which the main character is in part enraged because he thinks his brother and wife had an affair. The character smashes his kitchen and ultimately has a violent confrontation in the end with his brother and the police. On May 27th, Turner took a video with her phone in her pocket partway through a fight with Kelly, so only audio is decipherable. Ex. 105. In the audio Kelly can be heard threatening Turner that "it will be the worst day of your fu**ing life" and daring her to "push his buttons." When Turner stated that she knew Kelly was "capable of murder" he responded

> Dude, you're fu\*\*ing so close to just breaking me to the edge like
> that dude on TV, dude, you're gonna do it and guess what, it's not
> gonna be fu\*\*ing pretty, it's not gonna be pretty and guess what, I
> don't give a fu\*\* any more. You're gonna push me so fu\*\*ing far
> that I won't give a fu\*\* any more, and it's gonna be fu\*\*ing
> terrible, I'll just tell you that.

*Id.* Turner credibly testified that this was a veiled threat that Kelly would snap like the character in Brothers and kill Turner.[8]

On May 28, 2024, Turner drafted a document titled "Insecurity: The Destroyer of Worlds." Ex. 3 at 14-18. He wrote it after another fight with Turner. He gave it to Turner. This document explains the negative effects a partner's insecurities have on "the man," and the resulting negative outcomes to the man and "his daughter." Although Kelly testified that this document was not about Turner and was not even aimed at women but was instead directed at "people," the content of the document is clear that if it is not specifically about Turner, it is about insecure women and their male partners. *See, e.g., id.* at 15 (setting out the difficulties for "the man" in dealing with the insecure partner); *id.* ("Constantly trying to appease an insecure partner can cause a man to lose sight of his own needs, desires, and identity."). This document did not improve Kelly's relationship with Turner.

The attacks on June 1, 2024, were the final straw for Turner. Kelly had been raging for three days and was in a rage all day. There were a few violent encounters between Kelly and Turner that day, some of which were caught on video. The problems began in the morning. Kelly

---

[8] Kelly testified that this was after they had watched a TikTok video about the movie *Brothers*, and that it was not a threat of violence because Turner brought up murder, not Kelly. The Court does not find Kelly's explanation credible, particularly given his statements on the video. When Turner states that she knows Kelly is capable of murdering her, he does not respond that she is wrong or misconstruing what he is saying, but instead confirms that she is close to pushing him to the edge and that it will not be pretty and will be terrible. If the conversation were not about her pushing him to the point of killing her, when she mentions him murdering her, a reasonable person would reassure her that was not what he is saying.

was yelling at Turner for not pulling her weight and destroying the business. Turner went outside

with MKK and Kelly continued to yell from inside the house. MKK was playing on the stairs

next to Turner. Turner texted a friend about Kelly's abusive behavior and the friend advised

Turner to record Kelly's conduct. Turner began recording on her phone. Kelly came outside,

screaming at Turner, and shoved her down. Ex. 101. MKK can be heard crying. Kelly continued

to shout profanities at Turner for 30 seconds after she had been knocked down and while MKK

continued to scream louder and louder. Turner picked up MKK to comfort her. Kelly continued

to yell and berate Turner for another 30 seconds, and then walked away. Kelly showed no

concern for MKK.

Kelly returned outside, this time with Turner's tattoo machines. Turner had these

machines for nine years, since she first became a tattoo artist. Kelly yelled that if Turner can

destroy his things, then he can destroy hers and that would be fair. Ex. 102. Turner attempted to

calm Kelly, and MKK began to cry. Kelly smashed Turner's equipment, while shouting

profanities. One did not break, so he smashed that one again until it broke. MKK screamed

louder. When Turner commented, "God, she's f*cking shaking" about MKK, Kelly responded,

"Well, hey [Turner] so am I, I can't f*cking make a living, but you don't give a f*ck." *Id.* Kelly

showed no concern for MKK's distress, focused only on his own interests.

Kelly returned again, taunting Turner about breaking her equipment. MKK cried again.

Kelly stated, "Look at what we're doing in front of our child because of you, you f*cking c*nt."

Ex. 103.

At some point during the altercations on June 1st, Kelly commented that he was thinking

about killing Turner and she responded that she could break up with Kelly without him

murdering her. As discussed above, the Court does not find credible Kelly's testimony that his

comment was a "sarcastic" response to an earlier comment by Turner. The Court finds it was a credible threat of harm. This was the second credible threat made by Kelly—the first was a veiled threat alluding to the movie *Brothers*—and this was a direct threat.

Turner did not report these incidents of abuse to the Mexican police. She did not speak Spanish, and she did not believe they would help her. She believed that to get help she needed to return to her home country, the United States.

**E. Turner's Arrival with MKK in the United States and Subsequent Events**

In the early hours of June 2, 2024, Turner took MKK without the permission of Kelly and left Mexico. Earlier that evening she had taken her passport and MKK's birth certificate out of the envelope where they were usually kept in a kitchen drawer and put them inside her journal, which she left in the kitchen. She was worried Kelly would take the envelope of important papers and lock it in his truck. She did not take her journal to her room, however, so as not to raise Kelly's suspicions. Kelly, however, took Turner's passport and MKK's birth certificate out of Turner's journal and locked them in his truck. The Court does not find credible Kelly's account that he found the documents earlier that evening lying on the kitchen table in full view and put them back in the drawer. Turner testified that she thoroughly searched the drawer, as quietly as possible in the middle of the night, as she was leaving. She then remembered hearing Kelly going to the truck earlier in the evening and presumed that he had locked up the paperwork. She decided to leave without the documents. If Kelly had returned the documents to the drawer in which they were always kept, it is not believable that Turner would have left without them. It is much more difficult to cross the border without those documents.

Turner left an apologetic note. Ex. 10 at 16-17. She stated that she loved Kelly and they had created a beautiful daughter together. But Turner also explained that after Kelly told her he was thinking of ending her life, she did not feel safe and she could not live in fear. She described

that leaving as she did was the only way she thought she could leave safely. She explained that she could not take her dog Stella and asked Kelly to love and take care of Stella as he had always done. Turner testified that she wrote this note so that Kelly would not worry that she and MKK had been kidnapped.

Although Kelly argues this note demonstrates that he could not have been as abusive as Turner now claims, the Court notes how common it is for survivors of domestic abuse to have conflicted feelings in leaving their abusers and have strong feelings of love for their abusers, including by repeatedly returning to their abusers. *See, e.g.*, *United States v. Lopez*, 913 F.3d 807, 823 (9th Cir. 2019) (describing the how expert testimony on battered women syndrome can dispel the ordinary "'perception that a woman in a battering relationship is free to leave at any time,'" and can help with "an understanding of why victims of abuse sometimes make inconsistent statements or act in ways that appear counterintuitive to a layperson" (quoting *United States v. Nwoye*, 824 F.3d 1129, 1140 (D.C. Cir. 2016)).

Turner first went with MKK to Alameda County, California. On June 2, 2024, after Turner had left him, Kelly sent Turner a text stating that Stella had been hit by a car and was lying on the side of the road. Ex. 13. He also texted that it was illegal for Turner take MKK and that she and anyone who helped her would be "charged" and MKK would end up in foster care. *Id.*

On June 3, 2024, Kelly sent Turner another text, admitting that he had said he wished she was dead and that he wished she would kill herself, but arguing that he "said those things out of frustration and anger." He stated that Turner's "insecurities is [sic] what drives people to violence." *Id.* He threatened to "press charges" for "abduction of our child" against Turner and Mr. and Mrs. Martinez. He again threatened that MKK would end up in foster care. *Id.*

On June 4, 2024, Kelly, representing himself, filed a Hague application in Mexico. Ex. 3. He then posted on his "Oregon Peer Alliance" website MKK's birth certificate listing her as an "abductee" and Turner's passport, listing her as an "abductor." Ex. 116. He included a "list of people aiding the abduction of MKK" that included his father, the Martinezes, Turner's ex-husband, and Turner's sister Samantha Narducci, along with their telephone numbers, email addresses, and physical addresses. *Id.* at 2. He included other pages from his Hague application. He showed no concern for publicly posting his daughter's birth certificate online.

On June 6, 2024, Turner obtained in the Alameda County Superior Court of California an ex parte Temporary Restraining Order ("TRO") against Kelly. Ex. 108. This TRO precluded Kelly from contacting Turner directly or indirectly in person or by telephone, mail, email, or other electronic means ("No Contact Order"), and required that Kelly stay more than 100 yards away from Turner or her vehicle except when exchanging MKK for court ordered visitation. *Id.* at 4. It also prevented Kelly from harassing, threatening, following, stalking, or surveilling Turner, among other restrictions ("No Abuse Order"). *Id.* at 3. This TRO expired on June 27, 2024, when a hearing was scheduled on the matter. *Id.* at 1.

Kelly argues that Turner obtained the TRO in response to Kelly's *pro se* filing of the Hague application. He argues that Turner knew about his Hague application because Kelly's father called Kelly on June 4, 2024, and demanded Kelly leave Turner alone or Kelly's father would have his own lawyers ensure that Kelly never saw MKK. Kelly did not testify that his father mentioned the Hague application. His father's threat could have had nothing to do with the Hague application. Kelly had sent three threatening texts to Turner. Those texts also say nothing about Kelly's Hague application. They threaten Turner and others with criminal charges. The texts also twice threaten that MKK will end up in foster care, which is not the outcome of a

Hague application. Turner testified that Ms. Cassell, who worked for Turner's attorney, told Turner that Ms. Cassell could take care of everything and help Turner with paperwork to get a restraining order and that Ms. Cassell did take care of everything. The Court does not find that Turner filed for a TRO in response to Kelly's filing of the Hague petition in Mexico.

On June 21-22, 2024, Kelly created a "journal," which Kelly admits he did to manipulate Turner. Ex. 115. It describes that he loved and forgave Turner, and that he forgave himself. It also explains that he criticized Turner when he needed to be more forgiving. He explains that he slapped her in the face about a year ago. *Id.* at 4. He states that they were arguing about another woman and then Turner threatened to leave with MKK. Notably, this is inconsistent with his testimony before this Court about this incident, in which he described that he was sleeping and Turner woke him by shoving his phone in his face with a picture sent to him by another women, startling him. Mar. 27 Tr. 34:22-35:3. The journal then describes the April 2024 incident. Ex. 115 at 4-5. He admits to pushing against Turner's neck. *Id.* at 5. He explains that "[a]ll he wanted was for her not to leave." *Id.* He adds that they struggled and he tried to take MKK and he stopped because it was "freaking out" MKK. He followed Turner out and admits to screaming at her and "forcing her up against our fence." *Id.* This is while Turner is holding MKK. Kelly also describes that he took Turner's tattoo machine and "broke it by throwing it against a wall." *Id.* at 7. Kelly states that he wishes Turner would forgive him.

On June 24, 2024, the parties emailed one another during the day. Exs. 9, 111. Turner stated that she was considering meeting Kelly to talk, in a public location. Kelly responded by threatening suicide because Turner left him and took MKK. He noted the existence of the TRO. He said he was sending her "all my money." Later that night, near 10 p.m., Kelly emailed Turner

and again threatened suicide, saying he was "going now" and Turner must call him within 30 minutes to say "goodbye." Ex. 112.

 Kelly testified that he faked his suicide threats to "manipulate [Turner] into talking with me." Mar. 27 Tr. 53:21-23; *see also id.* 126:24-127:6. He sent her the money as part of his ruse to convince Turner that he was serious about his suicide threat. *Id.* 128:5-7, 129:3-10. Turner testified that she believed what Kelly said in his correspondence and it "destroyed" her. *Id.* 238:6-13. Turner's friend Ms. Cassell, however, warned Turner that it was a ploy and instructed her not to respond. Even though Turner wanted to respond to Kelly and was worried he might kill himself, she did not. She originally had suggested meeting with Kelly so he could be served the TRO papers. *Id.* 238:17-20. Turner did not speak to Kelly or meet with him. Her desire to hear him out to see if he was sincere, however, is common with survivors of domestic violence, who often return to their abusers. *See, e.g.*, *McGraw v. Soto*, 2017 WL 10506734, at *3 (C.D. Cal. May 30, 2017) (describing expert testimony explaining that victims of domestic violence often blame their abusers immediately after a violent event but then recant and return to their abusers for a variety of reasons, including financial dependence, fear, and love), *report and recommendation adopted*, 2018 WL 5794471 (C.D. Cal. Nov. 5, 2018).

 On June 26, 2024, at 6:19 a.m., Kelly emailed Turner asking for her to return money that Kelly had sent. Ex. 113. He acknowledged the TRO and argued that there was no need for it. That same morning at 7:31 a.m., he sent another email forwarding excerpts of his "journal" from June 21 and 22, 2024, and stating in the email that he loved Turner and MKK. Ex. 114. The journal included entries clearly aimed at manipulating Turner although not directed to her, and an "entry" addressed to Turner. Ex. 115. Later that morning at 10:37 a.m., Kelly emailed Turner asking how they could meet if Turner has a TRO and asking her to call him because he believes

they need to communicate. Ex. 9. Kelly was aware of the TRO, knew when the hearing was on the TRO, and these emails were sent the day before the scheduled hearing on the TRO. Although it does not appear that Kelly had legally been served the TRO papers, he knew of its existence and was continuing his ongoing efforts to manipulate Turner to avoid the TRO.[9] At the June 27, 2024 hearing, the TRO was extended, and it was further extended multiple times thereafter. *See* Exs. 118, 119.

On July 28, 2024, Kelly posted a video directed at Turner. Ex 107. This post is a violation of the No Contact Order, because it is communication by "other electronic means." In the post Kelly admits to destroying Turner's tattoo machines. The post also includes clips of other videos. These older, undated videos are from when Kelly and Turner were still together. One is the May 2024 video when Kelly is yelling at Turner while she is doing the dishes and MKK is sitting on the counter next to Turner, the "parental alienation" fight. Another video included by Kelly in this post is the clip where Turner says she wants to break up, a continuation of that May 2024 fight, and Kelly gets enraged. Several other clips show him yelling profanities at Turner while she responds quietly. When Kelly's counsel asked him to respond to what was shown, Kelly stated: "There's a lot going on in there in that video." Mar. 27 Tr. 152:21-23.

---

[9] The record is unclear when Kelly was served with the TRO. The October 22, 2024, Hayward police report states that Kelly was served the TRO documents at the June 27, 2024 hearing. Kelly attended the October 22, 2024 California hearing in person and the November California hearing by Zoom. He attended the November Oregon hearing by Zoom. His attendance at these hearings supports that he would have attended the June 27, 2024 California hearing, either in person or by Zoom. The parties, however, did not testify regarding this hearing. Regarding when Kelly was served, Turner testified that she did not recall but thought it was in June or July 2024, in Oregon. Kelly said he was served "months later." There is a video from July 28, 2024, where Kelly is showing a binder-clipped stack of TRO papers and stating that he was not properly served because Turner cannot "serve" him only with papers but must serve him with "all the f*cking evidence." Given this recorded statement and Turner's testimony, the Court finds that Kelly was served not later than July 28, 2024.

When the Court directly asked Kelly to respond to the Court's concerns about his rage shown in the videos, Kelly responded:

> I did get upset and—what people think of me as rage and yelling is often just a person being really passionate about what he does. And when I don't feel heard, I feel like I need to get louder sometimes because—because of not being heard. And if you were to ask me, like, was I in a rage in there—and some of it is yes, but a lot of it is just me with how I would normally speak. I am very passionate about what I do and the things I believe, and, you know, if you've ever heard any motivational speakers, they are passionate about what they are talking about. In my opinion, that's what it is for me most of the time.
>
> But yes, I do agree that I did raise my voice a lot. But I'm watching everything crumble in front of my eyes, and my partner, who is supposed to be helping, didn't seem to be helping, and it was frustrating, you know.

*Id.* 153:25-154:14

On August 10, 2024, Kelly posted a video directed at Turner, in which he speaks to her directly. Ex. 106. In this video he admits to "slapping" Turner "a year ago." This is another violation of the No Contact Order.

On October 22, 2024, the California state court held a hearing to consider extending the TRO. Turner and Kelly both attended in person. The judge extended the TRO. After the hearing, Ms. Cassell served Kelly with the restraining order from the Oregon court. Kelly became enraged. He demanded to see the judge again, but the clerk refused. The clerk suggested that Turner wait before leaving. Turner, Ms. Cassell, and Turner's attorney Mr. Torigian waited and left ten minutes later. That is when Kelly waited in the parking lot and then followed Turner's car until she pulled into the Hayward Police Department lot, as described above. Ex. 118. Kelly following Turner was a violation of the No Abuse Order.

On November 26, 2024, the California state court held a hearing, at which Turner attended and Kelly attended through Zoom. Kelly became enraged and shouted at the judge. He

was muted at various times during the hearing. When the judge ruled in Turner's favor, Kelly shouted "f*ck you" to the judge. Kelly testified that he believed the judge was biased against Kelly. Turner obtained from the California state court a two-year Domestic Violence Restraining Order against Kelly. Ex. 119. This included similar no contact and no abuse provisions as the TRO. *Id.* at 3-4. The California state court found that the most recent incident of abuse occurred on October 22, 2024. Ex. 120. That was the incident previously described that occurred after the October 22, 2024 court hearing, when Kelly followed Turner in his car.

Turner left California and took MKK to Washington County, Oregon. Turner also filed for a restraining order against Kelly in the Washington County Circuit Court. On October 18, 2024, she obtained ex parte a two-year Restraining Order to Prevent Abuse in Oregon state court. Ex. 109. This order had similar No Contact and No Abuse orders, precluding Kelly from contacting Turner in person or directly or indirectly by telephone, text message, mail, email, social media, or other electronic method, and directed Kelly to stay 150 feet away from Turner. *Id.* at 3-4. On November 29, 2024, the Oregon court held a hearing at which Turner was present and Kelly attended via video conference. Turner again lost his temper with the state court judge. He yelled that the judge should be ashamed and that he was ripping apart a family, and the judge eventually muted Kelly. Mar. 28 Tr. 298:9-14. When asked if Kelly believed this state court judge also was biased against him, Kelly responded that he believed "a lot" of state court judges were biased against men. Mar. 27 Tr. 137:14-19. Turner obtained from Oregon state court a Family Abuse Prevention Act order. Ex. 110. This order modified the original Oregon ex parte order only to reflect that the November 26, 2024 California order contained certain governing provisions. *Id.* at 1. Otherwise, the original order remained in effect. *Id.* The Oregon state court

continued to find that Turner was the victim of abuse committed by Kelly, that Turner feared for her physical safety, and that Kelly represented a threat to the physical safety of Turner. *Id.* at 2.

On January 15, 2025, Turner received a text message from a number she did not recognize. The message stated, in part, "I'm sorry. Please forgive me. Thank you. I love you." Mar. 28 Tr. 300:8-9; *see also* Ex. 121 at 4. This is a Ho'oponopono prayer that Turner and Kelly would regularly say to one another. Mar. 28 Tr. 300:7-11. Thus, although the number was from someone unknown, she believed the text was from Kelly. The remainder of the message stated: "I ask for forgiveness. I still love. We can still work out, even if that be friends. I'm open for change, for repair, for renewal." Ex. 121 at 4. She reported the text to the Cornelius Police Department as a violation of both the Oregon and California restraining orders. When the police called the number, however, it was disconnected and thus they could not proceed with any prosecution. Ex. 121 at 4-5. The Court finds, however, that based on Turner's testimony, the preponderance of the evidence supports that this text was from Kelly and is another violation of both the California and Oregon No Contact Orders.

Turner has family in Oregon. Turner had become estranged from her family due to the abusive relationship between Turner and Kelly. She reconnected with this family after leaving the abusive situation with Kelly. Turner intends to stay in Oregon.

Turner's family has grown close to and interacted with MKK since Turner left Mexico. Ms. Narducci testified regarding changes she has witnessed in MKK in the months she has been in the United States. Ms. Narducci described that when MKK first arrived, she was "stoic," "quiet," and "didn't speak," but would always scream if she heard a loud noise or someone talking loudly. *See* Mar. 28 Tr. 387:10-388:19, 389:12-390:8. Ms. Narducci explained that over the months since being away from Mexico, MKK improved in her ability to communicate and

interact with others, became less clingy with Turner, and lost her fear of loud noises. *Id.* 391:14-394:2.

Turner's testimony was consistent with Ms. Narducci's. Turner described that MKK would "freak out" if Turner would "raise [her] voice slightly" and MKK would "run to the corner and start crying" in the months after arriving. She explained that MKK was sensitive to anyone talking loudly and that it took five months for her to develop out of that fear. *Id.* 258:19-259:4. Turner also described how MKK originally was "shut down" and would not play with toys, and that took one month to resolve, but that MKK's speech is still behind. *Id.* 259:5-10. In describing MKK's conduct in Mexico, Turner explained that MKK would cry and scream during Kelly's rages, as is depicted in the videos, almost like a "panic attack." *Id.* 259:13-17. Now, however, MKK can tolerate loud noises and even yells at the dogs herself sometimes. *Id.* 259:18-22

In his Petition for Return, Kelly states that he has resided "exclusively" in Mexico "since 2022." Kelly, however, has been in the United States most of the last nine months. He has stayed in California, Oregon, and Arizona. He testified that he has a "lease" in Mexico, Ex. 7, but the document and other evidence is not persuasive. Many terms of the lease were left blank, he claimed that he could use the property for his business despite the lease expressly stating to the contrary, he provided no corroborating evidence from his purported landlord, and Kelly's explanations were not credible. He also testified that he had stayed in his leased property for approximately 90 days. He provided no evidence, such as any social media posts from Mexico or posts for retreats being held in Mexico, to support that he was in Mexico for even that long. Turner testified that all the posts she or Ms. Cassell saw were for retreats Kelly was offering in

the United States. Kelly testified, however, that he intends to take MKK back to Mexico if he prevails on his Petition for Return.

## CONCLUSIONS OF LAW

### A.  General Standards

The Convention was adopted in 1980 "[t]o address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (alterations in *Monasky*) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014)). The United States has ratified the treaty and enacted implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011. ICARA authorizes federal district courts and state courts to hear Convention petitions. *Id.* § 9003(a). Courts must decide cases "in accordance with the Convention." *Id.* § 9003(d). Contracting states commit to "use the most expeditious procedures available" to decide petitions arising under the Convention, with decisions generally expected within six weeks from the date of filing.[10] Convention, arts. 2, 11. Mexico also has ratified the treaty. *See, e.g.*, Hague Conference on Private Int'l Law, Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last updated November 14, 2022).

To establish a prima facie case under the Hague Convention, the petitioner must prove by a preponderance of the evidence that: (1) the child was "habitually resident" in a foreign country that is a signatory to the Convention; (2) the removal of the child breached the petitioner's custody rights under the foreign country's law; and (3) the petitioner was exercising custodial

---

[10] The parties agreed to extend the time for a decision in this case so they could submit supplemental briefing after the hearing.

rights at the time of the removal. 22 U.S.C. § 9003; Convention, arts. 3, 4. The Convention does not define "habitual residence," and courts have applied the standard that "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 589 U.S. at 77. "[A] child's habitual residence depends on the totality of the circumstances specific to the case" and is a "fact-driven inquiry." *Id.* at 71, 78. In general, a child's habitual residence is "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291-92 (3d Cir. 2006) (citation omitted). "For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Monasky*, 589 U.S. at 78. For children "too young or otherwise unable to acclimate, . . . the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases." *Id.* Immigration status of caregiving parents also is a relevant consideration. *Id.* at n.3; *see also Nisbet II*, 124 F.4th at 586; *Mozes v. Mozes*, 239 F.3d 1067, 1082 n.45 (9th Cir. 2001), *abrogated on other grounds by Monasky*, 589 U.S. 68.

"It is the Convention's core premise that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky*, 589 U.S. at 72 (cleaned up). Thus, "the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Id.* Therefore, "[w]hen a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott v. Abbott*, 560 U.S. 1, 9 (2010) (quoting Convention art. 12). One such exception is set forth in Article 13(b), discussed next.

**B.  Standards for Defense Under Article 13(b) in Cases of Spousal Abuse**

One exception to returning a child to the country of habitual residence is Article 13(b) of

the Convention, the "grave risk" defense. Article 13(b) provides:

> Notwithstanding the provisions of the preceding Article, the
> judicial or administrative authority of the requested State is not
> bound to order the return of the child if the person, institution or
> other body which opposes its return establishes that there is a grave
> risk that his or her return would expose the child to physical or
> psychological harm or otherwise place the child in an intolerable
> situation.

Convention, art. 13(b). "The party opposing return of the children . . . has the burden of proving

the ultimate Article 13(b) exception issue by clear and convincing evidence. Subsidiary facts

need be proven only by a preponderance of the evidence." *Danaipour v. McLarey*, 386 F.3d 289,

296 (1st Cir. 2004) (citation omitted); *see also* 151 Am. Jur. Proof of Facts 3d 177 (2015);

Deborah Reece, *Exposure to Family Violence in Hague Child Abduction Cases*, 36 Emory Int'l

L. Rev. 81, 87 (2022). This "exception is narrowly drawn, so as not to impair the Convention's

general policy." *Colchester v. Lazaro*, 16 F.4th 712, 718 (9th Cir. 2021) (quotation marks

omitted).

"The case law reflects that 'domestic violence is a common inciter to "abduction"—the

abused spouse flees and takes her children with her.'" *Id.* at 717 (quoting *Khan v. Fatima*, 680

F.3d 781, 784 (7th Cir. 2012)). Thus, the 'grave risk' defense "reflects the proposition that 'the

remedy of return . . . is inappropriate when the abductor is a primary caretaker who is seeking to

protect herself and the children from the other parent's violence.'" *Id.* (quoting *Khan*, 680 F.3d

at 784); *see also Van De Sande v. Van De Sande*, 431 F.3d 567, 568 (7th Cir. 2005) (noting that

the remedy of return is inappropriate in spousal abuse situations because "the remedy of return

puts the victim's most precious possession, her child, in close proximity to her batterer either

without her protection (assuming she does not return with the child), or with her protection, thereby exposing her to further violence" (cleaned up)).

When a respondent asserts the defense of a grave risk of harm based on domestic abuse, the respondent can meet her burden "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Colchester*, 16 F.4th at 718 (quoting *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014)). "Spousal violence may also 'establish a grave risk of harm to the child, particularly when it occurs in the presence of the child.'" *Id.* (quoting *Ermini*, 758 F.3d at 164, citing *Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (11th Cir. 2016); *Khan*, 680 F.3d at 787; *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000)). Courts have emphasized that "repeated physical and psychological abuse of a child's mother by the child's father, in the presence of the child (especially a very young child, as in this case), is likely to create a risk of psychological harm to the child." *See Hernandez v. Cardoso*, 844 F.3d 692, 696 (7th Cir. 2016) (quoting *Khan*, 680 F.3d at 787). Courts also have found a grave risk of danger to the child when the petitioning parent engaged in repeated acts of violence. *See, e.g.*, *Ermini*, 758 F.3d at 164 ("Domestic violence can satisfy the defense when the respondent shows by clear and convincing evidence a 'sustained pattern of physical abuse and/or a propensity for violent abuse.'" (quoting *Souratgar v. Lee*, 720 F.3d 96, 104 (2d Cir. 2013)). Isolated or limited incidents of spousal abuse, even if witnessed by the child, are insufficient to support a claim under Article 13(b). *See Ermini*, 758 F.3d at 165.

## C.  Analysis

Turner argues that Kelly fails to meet his burden to show a prima facie case. Turner contends that Kelly fails sufficiently to present evidence that: (1) he was exercising his custody rights, because he spent little time with MKK in the last year they were together; (2) Turner wrongfully took MKK under Mexico law, because he did not present evidence of Mexico's law

or how she violated it; and (3) Mexico was MKK's habitual residence, because the parties and MKK were not lawfully present in Mexico, the parties did not have a shared intention to stay in Mexico and raise MKK there long term, and Kelly does not have a genuine residence in Mexico at which to return. Turner also raises the grave risk defense under Article 13(b). Turner asserts that Kelly is a grave risk based on his history of spousal abuse and extreme rage. The Court assumes without deciding that Kelly meets his burden to show a prima facie case under the Convention, but concludes that his Petition for Return fails based on Turner's defense under Article 13(b).

### 1. Grave Risk Affirmative Defense

#### a. Relevant Caselaw

The Ninth Circuit in *Colchester* relied on four cases in support of the proposition that spousal abuse may support a finding of grave risk of harm to a child, all of which are instructive here. *Colchester* quoted *Ermini*, in which the Second Circuit set out the standards for when spousal abuse can suffice to support grave risk. 758 F.3d at 164. The Second Circuit in *Ermini* determined that spousal abuse was an additional ground for the "grave risk" defense, when the district court had not relied on spousal abuse in its grave risk finding. *Id.* at 164-65. The *Ermini* court held that ten violent incidents, including one that was witnessed by the children in which the petitioner had shoved the respondent into kitchen cabinets and attempted to "strangle" her; "discipline" in which the petitioner would strike the children; and one child's admitted fear of the petitioner was sufficient to support grave risk. *Id.* at 165.

*Colchester* also cited three more cases. The first is the seminal case of *Walsh*, which provides often-quoted guidance in evaluating spousal abuse cases asserting the grave risk defense. As the Court in *Walsh* explained:

credible social science literature establishes that serial spousal abusers are also likely to be child abusers . . . . [B]oth state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser. Thus, a congressional resolution, passed in 1990, specifically found that:

> Whereas the effects of physical abuse of a spouse on children include . . . the potential for future harm where contact with the batterer continues;
>
> . . . .
>
> Whereas children often become targets of physical abuse themselves or are injured when they attempt to intervene on behalf of a parent.

H.R. Con. Res. 172, 101st Cong., 104 Stat. 5182, 5182 (1990)

*Walsh*, 221 F.3d at 220 (citations omitted).

The Second Circuit in *Walsh* summarized the district court's errors in analyzing the underlying case based on spousal abuse:

> In our view, the district court committed several fundamental errors: it inappropriately discounted the grave risk of physical and psychological harm to children in cases of spousal abuse; it failed to credit John's more generalized pattern of violence, including violence directed at his own children; and it gave insufficient weight to John's chronic disobedience of court orders. The quantum here of risked harm, both physical and psychological, is high. There is ample evidence that John has been and can be extremely violent and that he cannot control his temper. There is a clear and long history of spousal abuse, and of fights with and threats against persons other than his wife. These include John's threat to kill his neighbor in Malden, for which he was criminally charged, and his fight with his son Michael.

*Id.* at 219-20.

The Ninth Circuit in *Colchester* also cited *Gomez* as authority for when spousal abuse might support a grave risk defense. In *Gomez*, the Eleventh Circuit acknowledged that in the circuit, "where violence is directed at a parent that may threaten the well-being of a child, the

PAGE 36 – OPINION AND ORDER

[grave risk] exception found in the Convention may apply." 812 F.3d at 1013. The court also noted "[t]hat a child's proximity to actual or threatened violence may pose a grave risk to the child is echoed by decisions found in our sister circuits." *Id.* at 1014 (gathering cases). The Eleventh Circuit explained:

> Even if the rule that sufficiently serious threats to a parent can pose a grave risk of harm to a child had not been established in this Circuit, we would nonetheless adopt such a rule now. Ruling to the contrary would artificially and unrealistically ignore the powerful effect that a pattern of serious violence directed at a parent may have on his children. Indeed, in this case, gunshots directed at Salvi's girlfriend could have struck M.N. had she been in the car when Poblete was shot. That the shots were not directed at M.N. would be of little moment in such a scenario. Similarly, it requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child.

*Id.*

The third case cited by the Ninth Circuit in *Colchester* is *Khan*. In *Khan*, the Seventh Circuit explained that a wife's testimony would support a finding of grave risk of psychological harm when the testimony

> reveals that her husband has a violent, ungovernable temper, had physically abused her on many occasions, some in the presence of [their not quite three-year-old child], . . . had been rough on occasion with the child—indeed terrified the child—and that the child's mood had brightened greatly when she was living apart from her father.

*Khan*, 680 F.3d at 785. The wife testified that she had been beaten by a sofa pillow, knocked down in front of the child, hit in the chest by a wallet hurled at her, choked by him twice, threated with having her eyeballs yanked out, and dragged bodily across the backyard. *Id.* at 786. The Seventh Circuit remanded for further proceedings because the district court had ignored the testimony of the wife, but the court specifically concluded that the wife's testimony, if believed, would support a finding of grave risk of psychological harm to the child. *Id.* at 786.

Other circuit court cases provide more guidance in the context of when spousal abuse and rage might support a finding of grave risk of harm. In *Acosta v. Acosta*, the Eighth Circuit affirmed the denial of a petition for return even though there was little evidence of abuse of the child because of the grave risk that the father's violent temper might turn on the child. 725 F.3d 868, 876 (8th Cir. 2013). The Eighth Circuit explained:

> The evidence presented to the district court supports its finding that Ricardo's inability to control his temper outbursts presents a significant danger that he will act irrationally towards himself and his children. Ricardo's assault of the taxi driver in his children's presence, his verbal abuse of Anne in their presence, and his shoving of M.A.A. demonstrate that Ricardo is either unwilling or unable to shield the children from his rage.

*Id.*

Another instructive case is *Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008). In *Baran*, the Eleventh Circuit emphasized that "[t]o deny return, the district court was not required to find [the child] had previously been physically or psychologically harmed; it was required to find returning him to Australia would expose him to a present grave risk of physical or psychological harm." *Id.* at 1346. The court concluded that the respondent met that burden through "testimony that Baran had placed [the child] in harm's way by abusing Beaty while she was pregnant, verbally berating Beaty for hours on end while she held [the child] in her arms, and handling [the] newborn [child] irresponsibly while drunk." *Id.*

### b. Discussion

The Court begins with *Colchester*, which explains that return is inappropriate when the petitioning parent inspired fear in the child. *Colchester*, 16 F.4th at 718. The videos and testimony of Turner show that Kelly repeatedly inspired fear in MKK. Kelly's shouting fits of rage regularly caused MKK to scream in fear. These were not isolated incidents, but occurred regularly due to Kelly's uncontrollable violent temper. Kelly also physically assaulted Turner in

MKK's presence, even hitting MKK with a bottle on one occasion. The Court easily finds that this conduct inspired fear in MKK.

Colchester next establishes that spousal abuse alone can support the denial of a petition, relying on four cases. This case resembles all of those instructive circuit court cases. Like Ermini, Kelly shoved and strangled Turner in the presence of MKK and inspired fear in MKK. Like the petitioner in Walsh, Kelly has a generalized pattern of violence, a history of spousal abuse, repeated disobedience of court orders, violence and violent temper directed at Turner while holding MKK evidencing a complete disregard for MKK's safety, and an inability to control his temper. Although Kelly has not threatened to kill a neighbor and been criminally charged for it, he threatened to kill Turner.

Additionally, similar to the respondent in Khan, Turner was strangled, dragged across the yard and pushed against the fence, slapped, threatened to be killed, and had a water bottle thrown at her that hit her child. MKK was put in fear of Kelly's rage and, like the child in Khan, MKK showed improvement of her fear of loud voices after leaving Kelly's influence. As the court in Gomez emphasized, the violence directed at Turner in the presence of MKK could, and did, end up hitting MKK because Kelly disregarded MKK's safety, not to mention the harm to MKK of bearing witness to such violence. See also Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 400 (E.D.N.Y. 2005) ("There is a wide-developed well-researched literature that a witness to domestic violence as a child is just as deleterious as if they were themselves the victims.").

This case also has similarities to the other instructive circuit court cases highlighted above. Like the petitioner in Baran, Kelly has abused his spouse in the presence of MKK and treated MKK irresponsibly by repeatedly directing physical and emotional abuse at Turner while she was holding MKK. Kelly placed MKK in harm's way and even hit her with a water bottle

aimed at Turner. He showed no concern for MKK's welfare, despite her regular screams of distress.

Similar to the petitioner in *Acosta*, Kelly has shown an inability to control his rage. He has had incidents of violent temper against his family, his friends, Turner's family, judges, police, and other authority figures, in addition to his many "rage fits" against Turner. There were at least a dozen days where Kelly was in a rage against Turner throughout the entire day. He showed an unwillingness or inability to shield MKK from that rage by verbally and physically abusing Turner while she was holding MKK or MKK was nearby. He also acted irately in court and repeatedly violated court orders.

Circuit cases raising the grave danger exception based on spousal abuse that have denied the defense also are instructive. In *Whallon v. Lynn*, the First Circuit affirmed denial of the exception based on verbal abuse and one incident of shoving the spouse. 230 F.3d 450, 460 (1st Cir. 2000). The First Circuit emphasized that no abuse had been directed at the daughter and also noted that there was no evidence the husband would disregard an order of the court, whether American or Mexican. *Id.* Here, there is more than verbal abuse and one incident of shoving, and the abuse showed a gross disregard for MKK's safety because she was in the arms of Turner during most of the abuse. Plus, there are repeated examples of Kelly violating court orders.

Similarly, in *Souratgar*, the Second Circuit affirmed the rejection of the exception where the child "never saw or heard either parent hit the other or try to hurt the other parent." *Souratgar*, 720 F.3d at 104. The court accepted the district court's findings that there was some spousal abuse, but no abuse directed at the child. Again, the distinction here is that Kelly abused Turner while she was holding MKK or MKK was nearby, thereby endangering and traumatizing MKK. Indeed, MKK was once hit by a bottle aimed at Turner. Further, in all the videos in which

MKK is screaming in distress, Turner never once showed any concern for MKK. He even expressly disregarded Turner's stated concern that Kelly's screaming was causing MKK to shake, and instead focused on his own distress about the state of his business, screaming even louder in response to Turner's comment about MKK's distress. This shows a severe lack of concern for MKK's safety and well-being.

Kelly's testimony demonstrates both that he does not accept the seriousness of his conduct and that his conduct poses a serious risk of a grave and imminent danger to MKK. Kelly testified that he regretted his actions toward Turner, but he repeatedly downplayed his actions. He claimed to only have three incidents of rage in his life, the three physical altercations against Turner, yet a video compilation was shown in Court of several more instances of rage. He then responded by claiming that what others see as rage is really only him being "passionate." This demonstrates his lack of understanding of his rage. He stated that he felt he was not being "heard." He added that the video was at a time of great frustration for him. Additionally, he earlier had attempted to explain one of his violent encounters by claiming that he did not "put his hands on" Turner, but then admitted that he "shoved" her, as if shoving a person is not putting one's hands on them. This causes concern that Kelly does not have an appreciation of physical violence. He also tried to justify that incident by stating that Turner provoked him, that he was frustrated, and that the situation was "unfair." These proffered excuses further show the mendaciousness of his claimed regret.

Overall, Kelly's testimony showed that he did not genuinely take responsibility for his actions. He blamed the victim, Turner. He also repeatedly blamed his "frustration" and not being "heard." But raising a toddler is rife with frustration and feeling that the child is not listening, creating significant concern about MKK's psychological and physical safety in Kelly's care.

That Kelly does not appreciate that he has a violent temper only heightens that concern. He has not sought any professional help, other than with a tarot card reader, and he has expressed no intention to seek professional help, such as anger management. Indeed, he has refused anger management in the past. The Court has little doubt that Kelly will have "rage fits" against MKK if she is returned to his care. *See, e.g.*, *Acosta*, 725 F.3d at 876 ("[Petitioner's] inability to control his temper outbursts presents a significant danger that he will act irrationally towards himself and his children. . . . Given [Petitioner's] violent temper and his disregard for protecting the children from its consequences, 'it would be irresponsible to think the risk to the children less than grave.'" (quoting *Van de Sande*, 431 F.3d at 570)).[11]

Kelly is a high-risk offender for violence. His testimony and conduct after Turner left shows that he feels like he is the aggrieved party. His videos display a significant sense that he is the victim of injustice, not only by Turner, but that others are using Turner to destroy Kelly. His testimony that he was provoked into violence, his text saying the same, and his testimony that both state court judges were biased against him are further evidence of his feelings of victimhood. Kelly also went to extremes to manipulate Turner. He repeatedly threatened suicide, pretended her dog was hit by a car, transferred her more than $1,300 to show he was serious about his suicide threats, and emailed her a final "goodbye." He destroyed some of her most important pieces of property, her tattoo machines. He also threatened Turner's life, both directly and veiled, before she left. And he repeatedly violated court orders. These are all high-risk indicators for violence. *See* Isabel Scott & Nancy McKenna, *Domestic Violence Practice and*

---

[11] The Court notes, as did the Eighth Circuit in *Acosta* in referencing recorded telephone calls, that "a written description of [the video recordings] does not begin to convey the chilling intensity of [Kelly's] rage that the recorded [videos] themselves communicate." *See Acosta*, 725 F.3d at 876.

*Procedure* § 1:13 (2017) (identifying four high risk factors for violence, including: perceived injustice mindset; threats of suicide to manipulate the victim; destroying property, physical fights, or cruelty to animals; and making direct or veiled threats).

In sum, the Court finds that Kelly engaged in repeated acts of rage and violence against Turner and others, demonstrating a pattern of and propensity for violence. Further, the manner in which he verbally and physically attacked Turner, while she was holding MKK or while MKK was nearby, reflected a gross disregard for MKK's physical and psychological well-being. *See Van De Sande*, 431 F.3d at 570 (noting the "grotesque disregard for the children's welfare that [the petitioner] displayed by beating his wife severely and repeatedly in their presence and hurling obscene epithets at her also in their presence"); *Khan*, 680 F.3d at 786 ("If the mother's testimony about the father's ungovernable temper and brutal treatment of her was believed, it would support an inference of a grave risk of psychological harm to the child if she continued living with him.").

Kelly's conduct was not isolated or sporadic and shows a propensity for uncontrolled rage and violence. *See, e.g.*, *Ermini*, 758 F.3d at 165 (concluding that the district court's "findings evince a 'propensity' for violence"). Kelly also violated his court-issued restraining order after showing a violent temper in court, revealing a level of harassment despite court intervention that heightens concerns about his ability to control his rage and violent tendencies. "The probability that [Kelly] . . . [a] person of violent temper . . . would some day lose control and inflict actual physical injury on [MKK] [can]not be thought negligible." *See Van De Sande*, 431 F.3d at 570; *see also Elyashiv*, 353 F. Supp. 2d at 409 (concluding that the petitioner posed a grave risk of physical harm because of his "inability to control his temper, his pattern of domestic abuse and his threats" against the child). Additionally, Kelly repeatedly violated the

California and Oregon restraining orders by contacting Turner directly and indirectly through text, email, and social media.

Kelly's rage and abuse affected MKK. Although Turner did not provide expert evidence, Ms. Narducci and Turner both testified as to behavior that was obvious to a lay person. MKK screamed hysterically on the videos during Kelly's rages. Turner testified that is how MKK responded to all of Kelly's rages. Ms. Narducci and Turner described that after MKK arrived in the United States, she generally was quiet, but would scream hysterically at loud noises, particularly raised voices. Ms. Narducci even stated that in the beginning, "every time" MKK heard a loud noise, she would have a "screaming fit." Ms. Narducci and Turner also both testified to MKK's change in demeanor after several months of being away from Kelly's violent temper—MKK became able to withstand loud noises without any problems.

This case is similar to, although with stronger facts supporting application of the Article 13(b) defense than, *Davies v. Davies*, 2017 WL 361556 (S.D.N.Y. Jan. 25, 2017), *aff'd*, 717 F. App'x 43 (2d Cir. 2017). In *Davies*, the district court concluded that the petitioner had an "erratic temper" and exhibited violence on many occasions, although the violence "did not result in physical injuries to Ms. Davies or K.D. but it was demonstrably uncontrollable, and dangerous." *Id.* at *8. The petitioner would "scream at [respondent] right in her face." *Id.* at *3 (cleaned up). The petitioner would do so in the presence of the child or when the respondent was holding the child. *Id.* at *4. Kelly did the same thing on many occasions to Turner. The petitioner in *Davies* would also behave violently, throwing things or pushing the respondent out of the way. *Id.* at *3. Kelly did the same, although he also pushed Turner down, hit her, and strangled her. The petitioner in *Davies* also sometimes yelled directly at the child. *Id.* at *4-5. Ultimately, the court in *Davies* found that the child "was the victim of severe psychological abuse and that the

likelihood of its recurrence if he were returned . . . is a near certainty." *Id.* at *18. The same risk is present here.

Based on Kelly's longstanding problems with rage and pattern of acts of violence and rage against Turner in the presence of MKK, the Court concludes by clear and convincing evidence that Kelly repeatedly physically endangered MKK and, particularly given her young age, exposed her to psychological harm. The Court further concludes by clear and convincing evidence that there is a grave risk that returning MKK to Mexico would expose her to physical and psychological harm.

### 2. Undertakings

"Under the Convention and ICARA, district courts' discretion to determine whether to return a child where doing so would pose a grave risk to the child includes the discretion whether to consider ameliorative measures that could ensure the child's safe return." *Golan v. Saada*, 596 U.S. at 678. These ameliorative measures are called "undertakings." "A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings." *Walsh*, 221 F.3d at 219. "The undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction." *Id.* "[A] district court has no obligation under the Convention to consider ameliorative measures that have not been raised by the parties . . . ." *Golan*, 596 U.S. at 679.

Kelly did not raise any potential ameliorative measures in his Petition for Return or Trial Brief. At the evidentiary hearing, counsel for Kelly asked Kelly: "If the Court were to order your child returned to Mexico subject to certain undertakings, would you follow the Court's orders with respect to those undertakings?" and Kelly responded, "Absolutely." Mar. 27 Tr. 56:19-22.

On redirect, counsel asked Kelly if he would be willing to attend anger management classes if doing so was "a condition for the return of your child to Mexico, to which Kelly responded, "Absolutely." *Id.* 145:18-23. At the end of the first day of testimony, counsel for Kelly asked the Court for leave to submit supplemental briefing on undertakings and the Court agreed, stating that both sides could "submit whatever additional briefing you want to." *Id.* 246:6-11. After all testimony was completed on day two, the Court again authorized the parties to "[b]rief whatever you want" by April 4, 2025, and then file simultaneous response briefs by April 14, 2025. Mar. 28 Tr. 443:24-444:1. The Court only foreclosed adding *evidence* to the record. *Id.* 444:1-3.

Kelly filed a supplemental brief. ECF 44. He did not, however, address undertakings or propose any ameliorative measures. The Court therefore finds that Kelly did not sufficiently raise the issue of undertakings and thus the Court declines to exercise its discretion to address undertakings.

If counsel for Kelly's question to Kelly on redirect about anger management class could be considered raising that as a proposed undertaking for the Court's consideration, the Court finds that undertaking to be insufficient to protect MKK. Where undertakings have been proposed, the Court's discretion is constrained in at least three ways:

> First, any consideration of ameliorative measures must prioritize the child's physical and psychological safety. . . . Sexual abuse of a child is one example of an intolerable situation. Other physical or psychological abuse, serious neglect, and domestic violence in the home may also constitute an obvious grave risk to the child's safety that could not readily be ameliorated. A court may also decline to consider imposing ameliorative measures where it reasonably expects that they will not be followed.
>
> Second, consideration of ameliorative measures should abide by the Convention's requirement that courts addressing return petitions do not usurp the role of the court that will adjudicate the underlying custody dispute. The Convention and ICARA prohibit courts from resolving any underlying custody dispute in

PAGE 46 – OPINION AND ORDER

adjudicating a return petition. . . .

Third, any consideration of ameliorative measures must accord
with the Convention's requirement that courts "act expeditiously in
proceedings for the return of children." Timely resolution of return
petitions is important in part because return is a "provisional"
remedy to enable final custody determinations to proceed.

*Golan*, 596 U.S. at 680-81 (citations omitted). Requiring Kelly simply to take an anger

management class is insufficient to protect MKK given the severity of Kelly's rage, abusive

conduct, and history of manipulation. *See Danaipour v. McLarey*, 286 F.3d 1, 25 (1st Cir. 2002)

("[U]ndertakings are most effective when the goal is to preserve the status quo of the parties

prior to the wrongful removal. This, of course, is not the goal in cases where there is evidence

that the status quo was abusive.").

Additionally, Kelly has a history that shows a disregard for judicial and other authority.

He repeatedly violated his restraining orders, repeatedly escaped from Sheridan prison camp, and

behaved in an aggressive and abusive manner to state court judges during proceedings, including

proceedings at which the short-term custody of his daughter was at stake. This raises concerns

whether Kelly would comply with any undertaking. *See Walsh*, 221 F.3d at 221. The Court thus

concludes that even if it could be construed that Kelly proposed the undertaking of anger

management classes, it would not sufficiently protect MKK from the grave risk of harm

presented by returning her to Mexico.

## D.  Conclusion

For the reasons stated herein, the Court DENIES Kelly's Petition for Return. ECF 1.

**IT IS SO ORDERED**.

DATED this 25th day of April, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge